The next matter, number 25-1348, New Hampshire Indonesian Community Support et al. v. Donald J. Trump et al. At this time, would counsel for the appellants please introduce themselves on the record to begin. Eric MacArthur for the government, and I would like to request three minutes for rebuttal. So this is not a complete Groundhog Day experience, but I leave it to you to decide how you want to use your time. Thank you, Chief Judge Barron. We've talked extensively about Wong Kim Ark, which is obviously a very important piece of this case. I do think that our position is fully consistent with Wong Kim Ark, which, at the end of the day, addressed the status of a domiciled alien. There are two cases from the Supreme Court that construe the scope of the 14th Amendment Citizenship Clause. So is your point that it answers the question or it leaves the question open? It answered it as to domicilies, and then it's an open question as to what it means as to everyone else. Or is your position it was a limitation in some way? I think you could read those key sentences on page 693 either way. I do think the most natural reading of what they wrote is that's the rule as they understood it, that domicile was necessary. I do think it is also possible to read it as saying, in essence, at least while domiciled here, at least while domiciled in the United States, and they weren't expressing a view about how the Citizenship Clause would apply to non-domiciled aliens. That's so, and then they, I mean, back to the statute, if it's not an answer, but then they're thinking about what Wong Kim Ark meant to them, and then they're thinking about what do we want it to be, and we've done these other things as far as the private bills and et cetera, and Wong Kim Ark is not a rule that they were violating with the statute, but this is what we want it to mean, and so we enact it. Should that affect if I think Wong Kim Ark is just sort of a, those were the facts, so that's all we've decided. Does that change how I should think about the statute? I think the statute, as I mentioned before, should be construed in harmony with the Supreme Court's understanding of the 14th Amendment. It doesn't mean the same thing. But if you just said the 14th Amendment is opaque on this question, and then we have executive branch practice that has gone on for 80 years under it, all of a sudden the executive branch can just walk in and say, no, we think it means something else now. That's sort of an odd way to run a railroad, isn't it? There had been a shifting executive branch. Since 1952? I don't know, since, I'm talking about the time period between. Right, but I'm saying once the statute's in place, there's very strong evidence of what the enactors of that statute thought. Your position was it doesn't matter, they were just trying to get what the Constitution meant. Now you say, but the Constitution might have been opaque to them because Wong Kim Ark didn't answer it. The evidence is that they thought it did answer it. They gave an answer that's contrary to what the order says. Everybody post-1940 and 1952 in the executive branch, with incredible regularity, has been operating on that understanding. If you want to pass another statute, pass another statute, but it's an unusual idea that the executive branch then comes in and says, you know, actually we're thinking about it another way now, just as a statutory matter. So I guess that's what I'm a little bit confused by. I don't think it's that unusual, Chief Judge Barron. The executive branch always has a duty and an obligation to interpret the Constitution and the statutes of the United States as necessary to implement them. One thing that we say about statutes is that they draw from longstanding understandings over time. They just recently, the court this term, I thought, just said that in some of these cases. They do, and I think the old soil that was imported into the INA is the 14th Amendment, the true meaning of the 14th Amendment. Whatever it is. As construed by the Supreme Court. And if that's what the executive branch today looks at, the original meaning of the 14th Amendment and the statute, and concludes that these categories of children are not. Relevant that everybody else thought otherwise for 80 years. Well, I mean, that can be taken on board as you weigh which interpretation is correct. If I take it on board, what should I do with it? Well, I think you should. How do I weigh it? I think ultimately here, you should look at the original meaning of the 14th Amendment. I don't dispute that there is a longstanding executive. But you would have to show that the old soil is just this open-ended idea. We just want to adopt whatever the Supreme Court wants. And so the one piece of evidence you have is the same words. But they didn't go through a whole legislative process that just said that. They went through a whole legislative process based on history that had happened and then passed those words. So the old soil would have to be some understanding that all we want to do is this narrow thing, which is take whatever the Supreme Court wants it to be whenever they want it to be. And the only evidence you have of that is the words. Is there anything else? I disagree. I think the only evidence we have is the words, although I do think the fact that they imported the 14th Amendment word for word is powerful evidence of that meaning and intent behind the statute. But again, the intent on the face of the statute is to create a comprehensive citizenship code. They start with the constitutional baseline on where they want to add additional categories of people who qualify as citizens. They do that in subsequent subsections, starting with subsection B, where they confer citizenship on the Native Americans by statute because they're not subject to the jurisdiction of the United States within the meaning of the 14th Amendment or section 1401A. But I do think ultimately the right answer here has to be driven and informed by the original meaning of the 14th Amendment. I don't dispute that there is a longstanding executive branch practice, dating from exactly when it's hard to say, at some point in the mid-20th century. This view of the Roosevelt administration took root, and the executive branch has followed it until now. But that executive branch practice is contrary to the first 30 to 40 years of the executive branch understanding, the scholarly understanding. Not directly contrary. There was at least debate at the time, even on your own account. Those first 30 years, there was no consensus position post-Wong Kim arc of your view. I think the post-ratification evidence of the understanding of the 14th Amendment is very lopsided in our favor. What evidence? I asked you this when you were here before, but what precisely are you pointing to as that lopsided evidence? So I would point again to the two 1885 passport denials by two separate secretaries of state that said that U.S.-born children of aliens who were not domiciled here were not born citizens within the meaning of pre-Wong Kim arc. It was pre-Wong Kim arc, but I don't think we should discount the evidence of the original meaning in the first 30 years. This is on the understanding that Wong Kim arc left this issue open, in other words, right? That's correct. On the understanding that Wong Kim arc left this issue open, we should be thinking about what is the original meaning, and that should be informed by looking at the congressional ratification debates and the contemporary executive branch. Yeah, go back. I'm sorry. Can you just repeat what you said? It was two decisions, the lopsided evidence. So there's two decisions of two secretaries of state. There is, as we discussed previously, the 1910 report from Assistant Attorney General William Wallace Brown. There's the New Jersey Supreme Court's 1895 decision in Benny v. O'Brien, which says that domicile is required. There's numerous scholarly commentators. I count that we have cited six treatises between 1881 and 1904 that said the children of non-domiciled aliens were not birthright citizens under the 14th Amendment. I don't recall seeing a single scholarly treatise from that time period. I don't quite know where this is going. I mean, the Chinese Exclusion Act was passed then. Obviously, they didn't take the view of Wong Kim Ark at the time, but I don't think you mean to say that shows that that was the view of the amendment. As to domiciled aliens, that's correct. I think Wong Kim Ark was correctly decided as to domiciled aliens because in large part when you look at the— If you want to know what the general consensus view was about the amendment, as the Chinese Exclusion Act shows, there was a good number of people who had quite an odious view of what it meant, which is why they passed the act. But it also turned out to be unconstitutional, so that's why I don't fully understand what this gets you to. Well, just because they were wrong about domiciled— Doesn't mean they were wrong about everything. Doesn't mean they were wrong about non-domiciled. But how do we know which they're right about and which they're wrong about? That's all. There was also, Judge Rickleman, in further evidence of this understanding in the first 30 to 40 years, there were three states, California in 1872 and North Dakota and Montana in 1895, that enacted statutes defining who were citizens of the states and they excluded the children of foreign ambassadors and transient aliens. So I think there is very substantial post-ratification evidence supporting the view that the children of non-domiciled aliens were not birthright citizens. I also think that comes directly out of the ratification debates, both in terms of members who specifically expressed the view of the people they called temporary sojourners, that their children would not be birthright citizens. That view was expressed by multiple senators and representatives. I'm not of anyone— I think that, again, the challenge is that view was also expressed by the dissent in Wong Kim Ark, not the majority. The lopsided evidence point is just difficult to square with the fact that it's reflected in the dissent rather than the majority opinion that's binding on us. I don't take the majority to have disagreed with the dissent on that point because the majority wrote the domicile limitation into its holding and its articulation of the governing rule of law. I think we just go back to the fact that the first— I won't get the number of pages correct, but the first 25 pages of the decision say the opposite because they start—the first point they make is the English law, English common law clearly held that temporary visitors would be covered. We have adopted the English common law into our own common laws at the time of the colonies. It has continued to this date, and then that's why, subject to the jurisdiction of, just covers these two classes of people. That's the whole first 25 pages of the opinion. So, I think there's a point to keep in mind about reading that first part of the opinion that I've referred to as the historical exposition part. I think the point that the majority was actually focused on and trying to refute was the idea that alienage of one's parents is itself a bar to citizenship under the clause. Okay? That's ultimately the point that they are trying to refute, and that's not our position. We're not drawing a line between citizens and aliens. We are drawing a line between citizens and domiciled aliens on one side and non-domiciled aliens on the other. So, I think you need to read that part of the opinion. But it's a fair point. The question is just whether the rationale they gave for resolving that question was broader than you say it is. But you've made the point. Your opponents made the opposite point. I think you can debate how broadly that rationale sweeps until you get to page 693. I'm not aware of any principle of interpreting a Supreme Court opinion that allows you to excise words that the Court included in its own statement of the applicable rule of law. But I do think, again, on the premise that Wong Kim Ark leaves this question open, which I do believe it does, at a minimum it's saying we're not deciding that question. That means we've got two cases from the Supreme Court construing the jurisdictional clause. One, 1884, Elk v. Wilkins, saying that the Native Americans are not subject to the jurisdiction of the U.S. within the meaning of the clause. One, Wong Kim Ark, saying domiciled aliens are. If it's not resolved, the way to answer that question is to go back and look at what was the original meaning of the 14th Amendment. And the best evidence of that is the ratification debates and the practice and understanding in the first 30, 40 years after ratification of the amendment. And the ratification debates, I think, are quite clear, not only because there were members who specifically addressed the topic of temporary sojourners, but because the debate over Indians sheds enormous light on what the framers meant by the term subject to the jurisdiction. Thank you. Thank you, counsel. At this time, would counsel for the appellees please introduce themselves on the record to begin? Good afternoon. Cody Wapsie, ACLU, for the plaintiffs. I'm cognizant of the time, and I don't want to repeat what has already been said today. I do want to pick up on the conversation and answer a couple of questions that have been out there. And I want to start on the statute, because I agree. I do not think it's gotten the attention that it warrants overall in this litigation so far. I think that we have, as I said, an incredibly strong statutory claim here from the perspective of codification of general understanding and a judicial interpretation. There's two aspects to it, and the Court's already discussed both of them. One is kind of what are the facts on the ground at the time in 1940, and then the other is what's the legal framework for understanding this claim. I think in terms of the facts, Chief Judge Barron, you're absolutely right, there is no skepticism of this point in the debates. It's extensively discussed this exact question of someone who may come and give birth shortly after arrival. Everybody agrees that person is a citizen under the 14th Amendment. There is no dispute about that. Some people may not like the implications of that in some circumstances, but that's not a disagreement about what the words in the Constitution and the statute actually mean. And I think it's notable. Nobody proposed getting rid of this provision, which Congress obviously could have. It could have modified the provision, could have turned it into, say, a person is a citizen if they are a citizen under the 14th Amendment. It's not what the statute says. And in fact, to your question, Judge Rickleman, I don't think it's accurate to say that this is just sort of a placeholder for the Constitution. This provision potentially goes beyond the Constitution, for example, in geographic scope. That's something that the immigration scholars make a point that they make in their brief. There were some questions in terms of the territories which would have birthright citizenship and which would not. This has a definition for the United States that includes those territories. It has actual meaning. And so I think that the idea that you can just ignore it goes contrary to the ways in which we ordinarily interpret statutes. We give meaning to every provision, every word of a federal law. And that's exactly what our interpretation does. In terms of the doctrine on this point, we've cited cases. They have not. And the Kosminski case, I think, is particularly notable. That involved a statute that took words from the 13th Amendment. And the Supreme Court very clearly says that what you do in that situation is you look at the understanding of those words at the time of the codification. Now, I think, Chief Judge Barron, you brought up the example of the Sherman Act. I think that's a sort of exception. Like race, isn't it? In one of the statutes implementing the 13th Amendment, I think race, they've held, is what race meant at the time of adoption. Exactly. I'm not familiar with that case. But that's the same principle as in Kosminski and Loffer in the cases we cite. I think that when you look at cases like the Sherman Act, what's going on there is it's use of a common law term. And so there's a very narrow set of cases about common law, which sort of incorporates the common law methodology of it changing over time. But in every other circumstance, you look at what the words meant at that time. And I've essentially heard the other side to concede that certainly that was the meaning that was presented to Congress in the report that was discussed in the debates. And it really is in some detail. The report to Congress talks about not just, here's what Wong Kim Ark said, that the children of non-domiciled, non-citizens are themselves citizens, talks about the schooner exchange and the entire sort of basis for the decision. It goes on and on. So again, you would think if there was disagreement about that, there would have been changes in the law. Obviously, Congress could have done anything it wanted. There is more to the statutory claim than that legislative history. There's the other provisions of the 1940 Act. There's the administrative practice leading up to it, which again is appropriate for the court to look at. And there is that whole range, as the court noted, of private bills between 1940 and 1952, which reinforce the same point. And then, of course, Congress again recodifies it, again discussing the point in 1952. It's really an overwhelming statutory basis. And I think, candidly, the government does not have much of a response on this entire point. I think- The government does say that the argument that you made, I think it's about 1401F, is not persuasive, the way that the government presents it, because they call it the foundling provision. It's just sort of universally recognized, and it doesn't really say anything about the specific issues in this case. Can you respond to that?  Look, I think that our point is you would have written the provision differently if you were actually coming into it with the perspective of that there were going to be all these people who were born in the United States, but non-citizens. Maybe you would build that into how you figure out whether a foundling actually should be appropriately deemed a citizen or not, given that the foundling provision says until you get some indication that their parents were, you know, that the person was, that the foundling was not born in the United States, you would say, well, or that their parents were- But I guess what the government, the federal government is saying is that this is just sort of a general rule about treating children found in a country where it's not clear who their parents are. And it doesn't say, I mean, do you disagree that that was sort of the general rule at the time? I'm not sure it may have been the general rule at the time. I guess the point is it's like you can look at that one provision in isolation, and maybe if that was all there were, then it wouldn't add much. But when you look at that alongside, for example, the naturalization provision, which says talks about naturalization of children born abroad, but has no provisions for naturalization for children born in the United States, and you look at all the provisions in the ALA brief under current immigration law, we're supposed to look at these statutes holistically and all together. There are probably dozens of provisions of federal law that all sort of work from this shared understanding that everyone born here is a US citizen with only the tiniest of exceptions for children. Ambassadors, basically, is the only exception today. And so I think you do have to look at it sort of all together, along with all the evidence that's marshaled in the immigration scholars brief. And together, I just don't see how you could get to the government's view. Is that a more generalizable point, that if you look at just statute after statute, the kinds of things that they rely on to permit proof of citizenship make the world of sense if the class of persons who don't qualify based on a birth certificate is infinitesimally small. There aren't that many foreign ambassadors, let alone foreign ambassadors who have children here. And fortunately, there aren't many invading armies, let alone invading armies that are having children here. But if you opened it up to as many people as the domicile rule would open it up to, it wouldn't make much sense that all these statutes seems to treat things like a birth certificate as so sufficient to demonstrate citizenship. I think that's absolutely right, Chief Judge Barron. And I imagine what the government would say on the constitutional claim is, oh, well, that's just everybody's gotten it wrong for 100 years, and all those statutes need to be reconsidered. That's not how we do statutory interpretation. You look at the full set of statutes that are all enacted both at the same time, and later it can even. I don't know if you think this is an analogy, but FDA versus Brown and Williamson, one of the reasons with tobacco, they thought that didn't have the right, there was too much seeming to be on the supposition that that wasn't something you could ban. I wonder if there's a similar analogy here. Yeah, absolutely. I was going to bring up the tobacco case, because I agree. I don't think that the court needs to go that far, because that evidence is candidly not necessary, given the strength of all the in-the-moment evidence that's before it. But I do think that there are all sorts of things that you can point to. Indeed, this is such a fundamental aspect of our constitutional system, and of what America is, that in many ways, a lot of the superstructure is built up on this very idea. And so if we go back to the constitutional question itself, and we were to talk about Wong Kim Ark, this will be the last five minutes we talk about Wong Kim Ark today. What do you say about the presence of that domicile language in those final paragraphs in 693 and 694? Why are they there? What's your account of why they're there? Absolutely. So the counsel for the government described it as an a for she or I point. And I actually agree with that. What the court is saying, really in the entire opinion, and then again in that section, is that the general principle is the principle drawn from common law, carried forward in common law, which is that everyone, subject only to those narrow exceptions, that's born in this country is a citizen. And we know that from the exchange, and so on and so forth. And what the court is saying is, given that principle, it just follows naturally that, of course, someone the child of someone who's domiciled in this country would also be a citizen, even if it is in the teeth of extraordinary anti-Chinese legislation, barring them from naturalization, threatening them with expulsion, and so on and so forth. Well, I guess that's my question. How much relevance do you think there is to the discussion of domicile in the way it appears at the end there, to the fact that it was an exclusion case in which part of the argument in the dissent, and I take it from the government, related to this idea that if you leave, that's a relevant fact for purposes of whether we can exclude you when you come back? So I think that the abandonment of citizenship issue at the end of the opinion is not particularly relevant to the overall question in front of this court. I'm asking whether it was more relevant to the overall question in front of that court, in which domicile then would have been relevant to that aspect of the question, even though it's not relevant here. I don't think that it makes domicile relevant to the 14th Amendment question. I think that the relevance of the Chinese exclusion, I apologize, I'm not understanding your question. Well, I think, I guess it's just a point that it wouldn't go to whether you're a citizen at birth. Yes. The expatriation doesn't challenge that you're a citizen at birth. It goes to whether you're a citizen at the moment when it matters to know whether you expatriated. And I had thought part of the argument in the dissent, the cases it identifies, are cases in which persons who were born here then left the country for many, many years and came back. He makes a point in the dissent of how can that person now claim to be a citizen. And one answer I had thought Wong Kim Ark was making, because it says that, is nothing happened during the minority of this child that would indicate at all, either through what his parents did or what he did, that the citizenship he had at birth was no longer his. That's exactly right. That's that last section. What I understand the court to be saying is I'm going to reserve the question of what exactly is the standard for when you can abandon your citizenship. This has been, as the court noted, was a major point of debate in 1940. But the reason they leave that aside was in part because of the domicile and the permanence of the presence. I thought that's what they give as part of the reason. I don't think so, Your Honor. I think what they're saying is, well, I think that's true as to him. Correct. That's what I'm saying, as to his situation. What I understand the government to be talking about is really the parents' domicile. And so I think that his domicile might be relevant to that. But the parents' domicile really is not. Just on this point, because obviously the court has asked about the use of domicile, I'll just quote from the opinion. I wouldn't normally do this, but I do think it's worth it in this particular instance. The court says, and this is the same language quoted, but I think that the government misunderstands it. It can hardly be denied that an alien is completely subject to the political jurisdiction of the country in which he decides. Seeing that, which means given the fact that, as said in a State Department report and since repeated by this court, independently of a residence with intention to continue that residence domicile, independently of any domiciliation, the person could be punished and so forth. And that's citing Calvin's case. So our point is, the general principle is it doesn't matter whether you're domiciled here. All people who are temporarily here are subject to the jurisdiction in the meaning of the 14th Amendment. And so therefore, of course, the same is true of a domiciled person. They say it's an officiary point, but I don't really understand. If they think that temporary allegiance and the exchange and all of that is irrelevant to somebody who has domicile, then what is that sentence doing? Why is it connecting those two? There's no logic to that. That wouldn't be an officiatory point. That would be like saying, because the sky is blue, it must be Tuesday. No, those actually don't follow from each other. Counsel, one other thing that we haven't talked about yet is, and it did appear in the opinion, is the fact that, of course, the word jurisdiction appears in multiple places in the 14th Amendment. And the Supreme Court in Wong Kim Ark was thinking about that and saying they have to mean consistent things. Can you just comment on that? Do you think it would work to have it mean what the federal government is arguing in one part, to have the word jurisdiction mean what they're arguing in one part of the 14th Amendment? How would that, practically, how would we have to interpret the 14th Amendment going forward? Yeah, I think it would create a lot of questions. I mean, as you point out, Wong Kim Ark itself says they have to mean the same thing. We ordinarily interpret words to mean the same things in the same document, unless otherwise. And of course, we know from cases like Plyler and elsewhere that in the second provision in the 14th Amendment that that use of jurisdiction would cover folks, including temporary residents and undocumented people and so forth. So you don't think there's any way to harmonize? Say we agreed with the federal government. Is there any way to harmonize the uses of jurisdiction in the 14th Amendment? It seems like a very difficult interpretive move, because what they're really saying is that there is this kind of secret understanding of jurisdiction that's not reflected anywhere, but that is the meaning of it in that first provision. And I just think it would be hard to say that the later provision would have sort of the ordinary understanding of within the jurisdiction, which we all understand today. I think it just goes to show that, actually, these words were used very much in a sense that we would recognize today, and that all that was really different, as you look in the debates, is what their understanding was about the situation of some of these groups, in particular, Native Americans. I think what the debates show is that there was real disagreement among the proponents of the 14th Amendment and the opponents about what the situation was for Native Americans, the extent to which they were or were not, for example, immune from federal action. And the proponents were really strong believers in tribal sovereignty. But the use of the term jurisdiction just meant jurisdiction in the way that the exchange used it, as Wong Kim Ark says, and that we would understand it today. With the court's indulgence, I have a couple quick points. Two minutes. Okay. Council noted the sort of permitted to reside language. That's a direct reference to fang wei ting, which is about expulsion. So somebody is no longer permitted to reside once they are deported. That's all that means. On the debates, I would just refer the scholars' brief, as well as some of the other amicus briefs that go through the sort of selective quotation of folks like Trumbull and so forth, and explain the ways in which, actually, the debates very much support our view. And then, just on the scholarly evidence that the government has pointed to, I'd just say, some of it, as the court noted, is in that period between Elk and Wong Kim Ark, and seems to misread Elk, reads it for a lot, which is exactly what the court rejects in Wong Kim Ark. Some of it is post-Wong Kim Ark, but just kind of parrots back what the earlier treatises had said. So that's not worth a lot if it's not engaging with Wong Kim Ark's reading. And then, some of it is really motivated opposition to the 14th Amendment and to Wong Kim Ark. And I put the 1910 State Department report in that category. Basically, it says, we need to do everything we can to get rid of birthright citizenship. That's not sort of a fair reading of Wong Kim Ark and of the 14th Amendment. Thank you. Thank you. Thank you, counsel. At this time, would counsel for the appellants please reintroduce himself on the record? He has a rebuttal. Still Eric MacArthur. Still Chief Judge Barron. I still, I just have three points. First, Judge Rickleman, I want to address your point about Wong Kim Ark, where it said, we need to read the Equal Protection Clause within the jurisdiction of a state to be coterminous with the jurisdictional clause of the Citizenship Clause. That statement clearly has not withstood the test of time, because we know that tribal Indians are not within the jurisdiction for purposes of the Citizenship Clause, but are protected by the Equal Protection Clause. No one thinks a state can pass a law that says that tribal Indians have to sit at the back of the bus. The Supreme Court was certainly sort of induced by the general structure of that argument in footnote 10. I mean, it's saying we have this term within its jurisdiction, and then they say, we've never considered that phrase before, but here's how we're going to figure it out. We're going to look to Wong Kim Ark, and then they cite something that says there can be no distinction between resident aliens whose entry into the United States was lawful, and resident aliens whose entry was unlawful. And so they say this phrase, jurisdiction, really seems to be about territory. And so- That's in the case about the Equal Protection Clause. So anything they said about the Citizenship Clause- Right, but it's ticked, I give you that, but they're thinking about this idea of keeping them together, and they say, how should we think about the Equal Protection Jurisdiction? Let's look at the other jurisdiction, and they go to Wong Kim Ark in 1982, and they say it's a territorial rule. So what's wrong with that? But my point is we know from actual Supreme Court holdings, not just from dicta, that the two clauses cannot be coterminous, because tribal Indians are not subject to US jurisdiction for purposes of the Citizenship Clause, but are within a state's jurisdiction for purposes of the Equal Protection Clause. Right, but we know that from that dicta, which we're usually required, we're usually required to follow it, there are other people who don't have to. But with respect to that dicta, it does at least suggest that their idea of jurisdiction was not tied to domicile. It may, I don't think- It may, I mean, it does, doesn't it? I don't think that footnote even rises to the level of considered dicta on the Citizenship Clause in a case that said nothing else about it. I do want to address the case that Mr. Wofsy cited, which I do think is his best case on the statutory point. This is the Kosminski case, where the court said we are going to look at the understanding of the language at the time the statute was enacted in these two provisions that implemented the 13th Amendment. I don't think it gets him over the finish line to where he wants to go, though, precisely because those were implementing legislation. They were doing something different from what the 13th Amendment itself did. Not the same purpose as we have here, where it's just copying the same language to grant citizenship. Also, both of the provisions at issue in that case were criminal prohibitions, and the court very much emphasized the need for a definite standard of liability in criminal cases, and said that's the reason we're only going to look to rights that have been made specific in the Supreme Court's actual decisions. And if I may make one final point, this is, again, going back to the bottom of page 693, Mr. Wofsy's. That's your favorite page. It is my favorite page. I like 694, too. I'd say it's your only page. 693 is very good, and I do think if you look at that sentence, it is an a fortiori point. The logic of which, and this goes back to my point about how there are degrees of allegiance and jurisdiction, the logic of this is, given that someone who is only here temporarily has this lower level of allegiance, it can hardly be doubted that someone who is domiciled here is within the complete political jurisdiction. Whether you think that's good logic or not, that is the logic of that sentence. You can't read it to say domicile is irrelevant when they've just limited their statement of the applicable rule in terms of domicile. Thank you all very much. Thank you, counsel. That concludes argument in this case.